IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**ROBERT SHROUT**

      **Petitioner,**

**v.**             **Case No. 2:13cv22**

**EVELYN SEIFERT, Warden,**

      **Respondent.**

FILED

JUL 21 2014

U.S. DISTRICT COURT-WVND
CLARKSBURG, WV 26301

## REPORT AND RECOMMENDATION

On March 18, 2013, Petitioner filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 1). This matter is assigned to the Honorable John Preston Bailey, Chief United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and LR PL P 2. Pending before the court is Respondent's Motion for Summary Judgment (ECF No. 29) and Petitioner's Motion for Appropriate Relief (ECF No. 35).

### PROCEDURAL HISTORY

**A.    Petitioner's criminal proceedings[1].**

On May 10, 1984, a Monongalia County Grand Jury returned a true bill of indictment charging Petitioner with one count of murder and one count of robbery. Case No. 84-F-42. On December 1, 1984, Petitioner was convicted of first degree felony murder.

---

[1]The only support for much of the information regarding the petitioner's underlying criminal trial is found on his criminal docket sheet found at ECF No. 15-1.

Counsel for the defense filed a motion for a new trial on December 10, 1984. The trial court entered an order denying Petitioner's post-trial motions on December 10, 1984.

On December 10, 1984, counsel for the State filed an information alleging Petitioner previously had been convicted of a felony and was a recidivist. On January 24, 1985, a jury found Petitioner to be the same individual previously convicted of felony sexual abuse on October 20, 1981. Petitioner filed a second motion for a new trial and a notice of intent to appeal on January 31, 1985. That same day, the trial court sentenced Petitioner to life with the possibility of mercy plus five years. Petitioner's effective sentencing date was January 21, 1984. The trial court denied Petitioner's motion for a new trial by order entered February 22, 1985.

Petitioner, by counsel, appealed his conviction to the West Virginia Supreme Court of Appeals ("WVSCA") on February 17, 1987. The WVSCA summarily rejected Petitioner's appeal on July 29, 1987. Petitioner did not pursue a writ of certiorari.

Petitioner filed a *pro se* petition for post-conviction relief with Circuit Court of Monongalia County on June 9, 1988. The state habeas court convened an evidentiary hearing on November 17, 1989. (ECF No. 29-6). By final order entered May 30, 1990, the state habeas court denied relief. It appears Petitioner appealed the

denial, and the WVSCA summarily denied the appeal.[2]

Petitioner filed a second petition for state post-conviction relief and DNA testing pursuant to W.Va. Code § 15-2B-4 on June 8, 2007. Petitioner alleged that the State introduced false and misleading evidence against him at his criminal trial and relied on In re West Virginia State Police Crime Lab, 219 W.Va. 408, 633 S.E.2nd 762 (2006).

By mutual agreement, evidence from Petitioner's original criminal case was tested. The state habeas court convened an evidentiary hearing on May 11 and 14, 2009. (ECF. No.29-5) By order entered May 31, 2011, the state habeas court denied Petitioner post-conviction relief.(ECF No. 29-11) Petitioner, by counsel, appealed the court's final order to the WVSCA, which denied relief by memorandum opinion filed May 29, 2012. (ECF No. 29-10)

### B.    Federal Post-Conviction Proceeding

---

[2]Respondent originally filed a Motion to Dismiss this § 2254 petition as untimely.(ECF No. 15) However, Respondent acknowledged that the WVSCA had no accessible record of this appeal, and therefore, it was impossible to determine when the appeal was rejected. In fact, Respondent provided no explanation how it could be certain that WVSCA ever acted on the petition, at all. Consequently, the undersigned recommended that the Motion to Dismiss as untimely be denied. (ECF. No. 21).  Said recommendation was adopted on December 12, 2013. (ECF No. 27) Respondent immediately filed the Motion for Summary Judgment which is addressed herein.

In support of his federal petition, Petitioner alleges the following ground for relief:

1. The Circuit Court erred by failing to rule Trooper Inman provided false or misleading testimony causing an innocent man to be incarcerated.

2. The Circuit Court erred in ruling that Petitioner is not entitled to a new trial in accordance with the _Frazier_ standard.

In what appears to be the brief submitted to the WVSCA in appealing the denial of his second post-conviction proceeding, Petitioner argues that the circuit court failed to consider that Trooper Inman testified that she conducted the serological testing on all the evidence submitted. While acknowledging that the circuit court did briefly consider Fred Zain's role in testing and analyzing various pieces of evidence which were ultimately presented at trial, Petitioner argues it did not address Trooper Inman's assertions that she conducted said testing.

Petitioner further argues that he proved that Trooper Inman offered false testimony. Accordingly, he argues that he is entitled to a new trial because he has established that his case comes within the five rules set forth in _State v. Frazier_, 162 W.Va. 935, 253 S.E.2d 534 (1979).

### C. The investigations of the State Serology Lab.

On June 2, 1993, the Prosecuting Attorney for Kanawha County, William Forbes, filed a petition with the WVSCA requesting the appointment of a circuit judge to conduct an investigation into the

policies, procedures and records of the West Virginia State Police Crime Lab's Serology Division, to determine whether habeas corpus relief should be granted to prisoners whose convictions were obtained through the willfully false testimony of Fred Zain.[3] The Honorable James O. Holliday, a retired circuit judge, was appointed to supervise the investigation.

On November 4, 1993, following a five-month investigation, Judge Holliday filed his report with the WVSCA. Judge Holliday made the following findings of fact:

> The acts of misconduct on the part of Zain included (1) overstating the strength of results; (2) overstating the frequency of genetic matches on individual pieces of evidence; (3) misreporting the frequency of genetic matches on multiple pieces of evidence; (4) reporting that multiple items had been tested, when only a single item had been tested; (5) reporting inconclusive results as conclusive; (6) repeatedly altering laboratory records; (7) grouping results to create the erroneous impression that genetic markers had been obtained from all samples tested; (8) failing to report conflicting results; (9) failing to conduct or to report conducting additional testing to resolve conflicting results; (10) implying a match with a suspect when testing supported only a match with the victim; and (11) reporting scientifically impossible or improbable results. Moreover, the [American Society of Crime Laboratory Directors/Laboratory Accreditation Board [ASCLD]] concluded that this misconduct was "the result of systematic practice rather than an occasional inadvertent error." [Footnote omitted].

---

[3] This request was made following the 1992 reversal of defendant Glen Dale Woodall's conviction by the WVSCA, after DNA testing had conclusively established that he was not the perpetrator of his crime of conviction. Zain had offered inculpatory evidence at Woodall's trial. Woodall subsequently filed a civil suit against the State of West Virginia. Thereafter, an internal audit of Zain's work was conducted by the State Police, which identified certain improprieties. This investigation was then ordered by the WVSCA.

* * *

> The overwhelming evidence of a pattern and practice of
> misconduct by Zain completely undermines the validity and
> reliability of any forensic work he performed or reported
> during his tenure in the serology department of the state
> police crime laboratory.  If the information which is now
> available concerning the pattern and practice of
> misconduct by Zain had been available during the
> prosecution of cases in which he was involved, the
> evidence regarding the results of serological testing
> would have been deemed inadmissible.

In the Matter of an Investigation of the West Virginia State Police

Crime Laboratory, Serology Division, 438 S.E.2d 501, 516, 518 (W.

Va. 1993)("Zain I").  Judge Holliday concluded that the findings of

fact made in his report constituted newly discovered evidence, and

recommended that "as a matter of law, any testimonial or

documentary evidence offered by Zain at any time in any criminal

prosecution should be deemed invalid, unreliable, and inadmissible

in determining whether to award a new trial in any subsequent

habeas corpus proceeding."  Id. at 520.

### Zain I opinion

On November 10, 1993, after the petitioner's first habeas had

been denied, the WVSCA issued its opinion in Zain I.  The WVSCA

found that "Trooper Zain's pattern and practice of misconduct

completely undermined the validity and reliability of any forensic

work he performed or reported, and thus constitutes newly

discovered evidence."  Id. at 506.  The opinion then sets forth the

appropriate standards of review for granting a new trial based on

newly discovered evidence, and for granting habeas relief based on

6

the use of falsified evidence.  Id. at 504-505.

The WVSCA agreed with Judge Holliday's recommendation that:

> in any habeas corpus hearing involving Zain evidence, the
> only issue is whether the evidence presented at trial,
> independent of the forensic evidence presented by Trooper
> Zain, would have been sufficient to support the verdict.
> As we earlier stated, once the use of false evidence is
> established, as here, such use constitutes a violation of
> due process.  The only inquiry that remains is to analyze
> the other evidence in the case under the [State v.]
> Atkins, [261 S.E.2d 55 (W. Va. 1979)] rule to determine
> if there is sufficient evidence to uphold the conviction.

Id.  The WVSCA applied the Atkins rule in its review of claims

concerning falsification of evidence by Zain, stating:

> Where improper evidence of a nonconstitutional nature is
> introduced by the State in a criminal trial, the test to
> determine  if  the  error  is  harmless  is:  (1)  the
> inadmissible evidence must be removed from the State's
> case and a determination made as to whether the remaining
> evidence is sufficient to convince impartial minds of the
> defendant's guilt beyond a reasonable doubt; (2) if the
> remaining evidence is found to be insufficient, the error
> is  not  harmless;  (3)  if  the  remaining  evidence  is
> sufficient to support the conviction, an analysis must be
> made to determine whether the error had any prejudicial
> effect on the jury.

Id.

## Zain II opinion

On May 20, 1994, again after Petitioner had filed his first

habeas corpus petition in the Circuit Court, the WVSCA issued its

opinion in In re: An Investigation of West Virginia State Police

Crime Lab Serology Division, 445 S.E.2d 165 (W. Va. 1994) ("Zain

II").  In that proceeding, Judge Holliday was asked to investigate

and report  on whether other serologists at the State Police Crime

Lab had committed acts similar to Zain. Judge Holliday found some evidence of errors by other serologists, but concluded that they were "relatively minor," "occasional" and "not the result of an intentional and systematic subversion of the criminal justice system." Id. at 167. Furthermore, the errors found "did not appear to have 'significantly compromised the prosecutions of the cases in which these other serologists were involved.'" Id. The ASCLD team that conducted the investigation noted that "No instance was found in which an error or omission was likely to have had a significant impact on the conclusion, nor the weight given to the conclusion, on an apparently probative item of evidence." Id. at 167 n.2. On the basis of this report, the WVSCA held that "serology reports prepared by employees of the Serology Division of the West Virginia State Police Crime Laboratory, other than Trooper Zain, are not subject to the invalidation and other strictures contained in Zain I." Id. at 168.

### Zain III opinion

On June 16, 2006, before the petitioner filed his second habeas corpus petition in the Circuit Court, the WVSCA issued its opinion in In re: Renewed Investigation of the State Police Crime Laboratory, Serology Division, 633 S.E.2d 762 (W. Va. 2006) ("Zain III"). In that decision, the Court again addressed whether serologists in the State Police Crime Lab, other than Fred Zain, falsified evidence in criminal prosecutions. In the course of this

third investigation, two expert witnesses, Mark Stolorow, Executive Director of Orchid Cellmark Laboratories, and Ronald Linhart, an inspector with the ASCLD, authored a joint report that was filed on December 2, 2004. (hereinafter the "Stolorow/Linhart report"). Id. at 765. The Stolorow/Linhart report concluded:

> The errors found by this investigation were frequent, recurring and multifaceted, spanning the spectrum of examiners. However, it must be stressed that in only one instance does it appear that erroneous procedures, documentation, reporting or testimony led to a false, but non-probative, association between a defendant and the biological evidence (State v. Gray and Finney) . . . The authors of this report do not ascribe any particular motive, intent or design to the scientists in regard to the errors made . . .

> Finally, there is a significant qualitative difference between the errors discovered during this investigative review and the shocking and egregious misconduct documented in Zain I. The intentional and willful malfeasance and reckless disregard of both truth and good scientific practice exhibited by Fred Zain were not found to exist in these cases among the remaining serologists in the laboratory.

Id. at 766. The report described the work product of the other serologists as "potentially unreliable." Id.

Following receipt of a report from the Honorable Thomas A. Bedell, who succeeded Judge Holliday as special judge assigned to these matters, the WVSCA issued its decision, which held:

> After careful review of the Stolorow/Linhart findings, the special judge's report, and the briefs of the prisoners and the State, this Court concludes that there is insufficient evidence of intentional misconduct to justify invalidating the work of serologists other than Zain.

Id. at 767. However:

9

> because of the significant number, frequency, and types
> of errors which Stolorow discovered in the work of the
> Crime Lab serologists, this Court finds it necessary to
> enact additional safeguards to ensure that prisoners
> against whom serologists offered evidence receive a
> thorough, timely and full review of their challenges to
> the serology evidence.

Id. at 769. Thus, the WVSCA set up a special habeas corpus procedure to be utilized by those prisoners against whom serologists, other than Zain, had offered evidence.

Accordingly, in habeas corpus cases involving serologists other than Zain, "a prisoner who challenges his or her conviction must prove that the serologist offered false evidence in his or her prosecution." Also the prisoner must satisfy the following standards indicating that a new trial is warranted: (1) The evidence must appear to have been discovered since trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained; (2) It must appear from facts stated in his affidavit that the defendant was diligent in discovering the new evidence, and that it could not have been discovered with due diligence before the trial; (3) Such evidence must be new and material, and not merely cumulative; (4) The evidence must be such that it ought to produce an opposite result at a new trial on the merits; and (5) A new trial will generally be refused if the sole object of the new evidence is to discredit or impeach an opposing witness. Id. at 769 (citing State v. Frazier, 253 S.E.2d 534 (W. Va. 1979)).

10

Concerning the special procedures, the WVSCA further held that a prisoner against whom a serologist other than Zain offered evidence is to be granted a full habeas corpus hearing on the issue of the serology evidence, with counsel appointed to represent him or her. The Court further held that the Circuit Courts must review the serology evidence "with searching and painstaking scrutiny" and must write "a comprehensive order" which includes "detailed findings as to the truth or falsity of the serology evidence." If the Circuit Court finds that the evidence was false, then the Circuit Court must determine whether the prisoner has shown the necessity of a new trial based on the five <u>Frazier</u> factors. <u>Id.</u> Finally, the WVSCA held that such proceedings must be conducted in as reasonably timely a manner as possible, and that such proceedings are not subject to the <u>res judicata</u> limitations normally applied to state habeas corpus proceedings. <u>Id.</u>

The WVSCA further specifically held:

> In order to guarantee that the serology evidence offered in each prisoner's prosecution will be subject to searching and painstaking scrutiny, this Court now holds that a prisoner who was convicted between 1979 and 1999 [footnote omitted] and against whom a West Virginia State Police Crime Laboratory serologist, other than Fred Zain, offered evidence may bring a petition for a writ of habeas corpus based on the serology evidence despite the fact that the prisoner brought a prior habeas corpus challenge to the same serology evidence and the challenge was finally adjudicated.

<u>Id.</u> at 770.

## STANDARD OF REVIEW

11

Title 28 U.S.C. § 2254(d), which was adopted as part of the Anti-terrorism and Effective Death Penalty Act of 1996 (the "AEDPA") provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000), the Supreme Court held that under the "contrary to" clause, a federal court may grant a writ of habeas corpus with respect to claims adjudicated on the merits in state court only if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) if the state court decides a case differently from the Supreme Court on a set of materially indistinguishable facts. The Court further held that under the "unreasonable application" test, a federal court may grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court only if the state court identifies the correct governing principle from the Supreme Court's decision, but unreasonably applies that principle to the facts of the prisoner's

12

case. Id. at 413.

Moreover, the AEDPA contains a presumption that a state court's factual findings are correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Rule 56 of the Federal Rules of Civil Procedure applies to habeas corpus proceedings. See, e.g., Blackledge v. Allison, 431 U.S. 63, 81 (1977); Maynard v. Dixon, 943 F.2d 407, 412 (4th Cir. 1991). Entry of summary judgment is appropriate when there is "'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Rule 56(c), Fed. R. Civ. P.).

## STATEMENT OF FACTS AND RELEVANT TESTIMONY

On January 14, 1984, Lina Jan Spindle was found murdered in her apartment. She had been strangled with a braided leather belt and possibly sexually assaulted and robbed of money from her purse. Petitioner and the victim's boyfriend, Paul Strawser, were identified as possible suspects. Evidence was gathered at the crime scene, from the victim and from the two suspects and forwarded to the West Virginia State Police Crime Laboratory for

examination and testing. After the investigation, Petitioner was arrested and charged with the murder and robbery of the victim. Petitioner, as noted previously, was found guilty of felony murder and sentenced to life with mercy.

At trial, Petitioner contended that he did not commit the murder, and he was not present in the victim's apartment the night that she was murdered. The defense further contended that the murderer was the victim's boyfriend, Paul Strawser. At the trial, the State offered testimony from Trooper Lynn Catherine Inman, a serologist from the West Virginia State Police Crime Laboratory. Trooper Inman testified that she was provided multiple items of evidence for examination and testing including known blood samples of the victim, Petitioner, and the victim's boyfriend, Paul Strawser, as well as vaginal swabs from the victim, cigarette butts found in the living room, bathroom and bedroom of the victim's apartment, clothing worn by the victim and clothing retrieved from Petitioner and a sleeping bag taken from the bed in the victim's bedroom.(ECF. No. 29-4, pp. 42,43,44,62).Trooper Inman testified that the victim was type O blood and Petitioner and the victim's boyfriend were each type A blood.(ECF. No. 29-4, pp. 52,54,56). Trooper Inman further testified that Lewis testing of the Petitioner and the victim's boyfriend's blood indicated that

Petitioner was a secretor, while the victim's boyfriend was not.[4] (ECF. No. 29-4, pp.55, 57).Trooper Inman testified with regard to efforts by her to determine the blood type of saliva from the cigarette butts, bodily fluids in the vaginal swab, and other stains from the sleeping bag. Trooper Inman testified that she was able to discern blood Type A on some of the cigarette butts found in the living room and bedroom, that the sperm fraction identified from the vaginal swab was blood type A and the semen stains on the sleeping bag were also blood type A. Based upon those test results, Trooper Inman was able to testify that Petitioner was a potential donor of the bodily fluids identified as blood group A because of his secretor status. Trooper Inman's conclusions were based, in part, on an inference that if a blood type was able to be detected from other bodily fluids those other bodily fluids were left by a secretor. Trooper Inman, in her testimony, excluded the victim's boyfriend as the donor of the items in question because of his determined non-secretor status. (ECF. No. 29-4, pp. 56-67).

In his second habeas petition, Petitioner requested DNA testing on available serological evidence. By Order of February 8, 2008, and upon agreement of the parties, the habeas court directed DNA testing of serological evidence by the West Virginia State Police Crime Laboratory – Biochemistry Division.

---

[4]A secretor is an individual's whose blood type can also be found in other bodily fluids such as saliva or semen.

The report generated from this testing, indicated that a sufficient amount of human DNA was recovered from one (1) vaginal swab, the sleeping bag areas 4 and 7, one (1) cigarette paper from the living room, three (3) cigarette papers from the bedroom, two (2) cigarette papers from the bathroom, the reference blood samples of Petitioner, and the victim's boyfriend, and the known blood specimen of the victim. The partial results identified from the vaginal swab("sperm and e-cell fractions") were consistent with a mixture of DNA from at least two (2) individuals. All the reportable results identified from the sperm fraction were consistent with a mixture of DNA from Petitioner and the victim. As a result, Petitioner could not be excluded as the donor of the spermatozoa identified from the vaginal swab.(ECF No. 29-7, p.94).

The victim's boyfriend was excluded as a possible contributor to the mixture of DNA identified from the vaginal swab.(Id. at 94-95).Partial results identified from the cigarette butts collected from the living room were consistent with a mixture of DNA from at least two (2) individuals. Petitioner could not be excluded as a possible contributor to the mixture of DNA identified from the cigarette butts collected from the living room. The victim's boyfriend was excluded as a possible contributor to the mixture of DNA in the cigarette butts. No conclusion could be reached concerning the victim as a possible contributor to that DNA.(ECF No. 29-7, p. 97). With respect to the cigarette butts collected

16

from the bedroom, the DNA results were consistent with the victim. No conclusions could be reached with respect to Petitioner. With respect to the sleeping bag, Petitioner, the victim, and her boyfriend were all excluded as possible contributors to the mixture of DNA identified from the sleeping bag.(ECF No. 29-7, p. 99.)

The habeas court concluded that the DNA testing on items considered to be crime related did not exonerate Petitioner. The most noteworthy of the items retested, in the Court's opinion, was the vaginal swab from the DNA testing which determined that Petitioner could not be excluded as the donor of the spermatozoa on the vaginal swab, that the primary results from the vaginal swab e-cell fraction were consistent with the victim, and that her boyfriend was excluded as a possible contributor to the mixture DNA identified from the vaginal swab. The court found that said result was consistent with and confirmed the serology testing originally conducted as part of the crime investigation which included Petitioner (a secretor), as a possible donor to the genetic markers found on the vaginal swab, and excluded the boyfriend as a possible donor to the genetic material.

The habeas court also determined that the serology testing conducted by Cp. Lynn Inman in 1984 at the State Police Laboratory was conducted in accordance with accepted standards for testing in use in laboratories at the time, and reflected the state of science at that time. The court further concluded that Cpl. Inman's report

and testimony did not incorrectly or falsely include Petitioner as a potential donor to the genetic material according to the available testing techniques. Her inclusion of Petitioner as a member of 33% of the possible donating population was neither incorrect nor false.

The transcript of Cpl. Inman's trial testimony was admitted as an exhibit at the "Zain III" hearing held on May 11 and 14, 2009. Cpl Inman had testified regarding an analysis that she conducted on the victim's known blood, vaginal swab and other items of potential evidentiary value collected from the apartment and submitted for serology examinations. In her report, which is dated May 18, 1984, there was no Lewis type listed under the victim's systems, nor under the systems of any of the other tested items, including the vaginal swab, cigarette butts and swatches from the sleeping bag. The habeas court concluded that Cpl. Inman did not falsely or incorrectly claim to have conducted Lewis testing on those items, because she did not include a Lewis factor on any item in that report.

On the second day of the habeas hearing, Lt. Brent Myers testified that the known blood and saliva of Petitioner was not submitted to the laboratory until July 5, 1984. It was analyzed immediately. The July 5, 1984 report shows that the only Lewis factor listed is for Petitioner's whole blood, on which the laboratory did have the capacity to perform Lewis testing in 1984.

18

The known saliva specimen of Petitioner was reported only to have an ABO system factor and did not falsely report a Lewis factor.[5] His known saliva specimen contained his ABO genetic marker, indicating that Petitioner was/is a secretor.

The known whole blood of the victim's boyfriend was submitted to the forensic laboratory on July 20, 1984, and his known saliva was received at the lab on September 5, 1984. The results of the examinations were set forth a in report dated October 11, 1984. Again, Cpl. Inman did not improperly report any Lewis factor in the saliva specimen of the boyfriend. The report indicated that no ABO genetic marker was obtained from the boyfriend's saliva, meaning that he was a non-secretor.

The habeas court determined that Cpl. Inmman correctly explained in her trial testimony that if one is a secretor, his/her ABO marker will appear in that person's saliva; and if one is a non-secretor, his/her ABO genetic marker will not be present in other bodily fluids such as saliva or semen. The court further concluded that at trial, Cpl. Inman testified only as to whether the tested items indicated that a potential donor was a secretor or non-secretor. She did not attribute a Lewis type(of a- b+ or a+ b-) to any of those tested items about which she was questioned. The only reference Cpl. Inman made to actual Lewis typing was an answer

---

[5]Lewis testing was not conducted on saliva or evidence stains until 1989 or 1990.

19

to a general question asked by the prosecutor. In answer to the question, Cpl. Inman referred to Lewis typing of a+ b- for non-secretors, without including the possibility of an a- b- secretor. Therefore, the habeas court found that although the answer was partially incorrect due to the omission of the a- b- secretor type, the important conclusion was that Cpl. Inman did not assign Lewis factors to tested items. Moreover, the habeas court found that based on the facts of the underlying case, and the theories of the prosecution and defense, Petitioner's and the victim's boyfriend's Lewis type, of a-b+ and a+b- respectively, were the only relevant Lewis factors. Testimony by Cpl. Inman regarding an a-b- secretor contributor to evidence stains would have been irrelevant to the case. Therefore, the habeas court found that Cpl. Inman's testimony omitting reference to a- b- type was harmless.

The habeas court also concluded that in her testimony, Cpl. Inman did not misstate the frequency statistics of the members in the general male population who could be donors to the stains on the vaginal swab, cigarette butts and sleeping bag. In particular, on cross-examination by Petitioner's trial counsel, she testified that one of three males could produce the findings in which Petitioner was included.(ECF. No. 29-4, p. 70). The habeas court found that Cpl. Inman's testimony, in essence, was inclusion of Petitioner as a potential donor to certain evidence stains or secretions and exclusion of the victim's boyfriend based upon

Petitioner's status as secretor and the boyfriend's status as a non-secretor. Finally, the habeas court determined that in closing argument the prosecutor did not overstate or misstate the serological evidence, and correctly conceded that the combination of genetic markers on items that were linked to Petitioner could also be linked to one-third of the population.

With respect to Fred Zain's involvement in laboratory testing, at the outset of the state habeas proceeding, the parties had been under the impression that he was not involved in testing of any items submitted to the laboratory in Petitioner's case. However, as pointed out by the state, "a close look at the raw data sheets indicated that Zain **may have** tested, or reported results, on four cigarette butts from the victim's apartment. Pursuant to "Zain I," the habeas court excluded the testimony of Cpl. Inman about those items. It also appeared that Fred Zain **may have** conducted a pgm test of the victim's known blood along with 11 other items from separate cases on February 15, 1984, as shown on the raw data sheets. The raw data sheets also showed that Cpl. Inman tested 5 other items relating to the victim on February 3 and February 7, 1984. Accordingly, the habeas court concluded that those items must also be excluded pursuant to "Zain I."

However, even after excluding the forensic evidence, the habeas court found that the remaining evidence was sufficient to support Petitioner's conviction. The habeas court undertook an

exhaustive recitation of the evidence that supported its conclusion.

Specifically, the habeas court found Petitioner was acquainted with the victim prior to her death and knew the victim lived at Marjorie Garden Complex. Joyce Shumiloff, bartender at Country Rock Bar testified Petitioner, the victim, and the victim's boyfriend were all at that bar on Friday afternoon, January 13, 1984. Shumiloff saw the victim's boyfriend hand more than $200 to the victim for safekeeping.(ECF. No. 29-3, p. 110). The boyfriend testified his January 13 paycheck was for $266.48 and, when cashed, he was given all $20 bills except for one $5 and one $1 bill. (ECF No. 29-3, p. 123). When the boyfriend handed the victim the money, Petitioner was immediately to the boyfriend's left. (ECF No. 29-3, p. 125).

Shumiloff testified that she invited Petitioner to her apartment that night, also at Marjorie Garden, to play cards, offering the potential of a blind date for him. (ECF No. 29-3, p. 112). Both Shumiloff and the boyfriend heard the victim tell Petitioner he could come to stay with her and her boyfriend at her apartment if the date did not work out.(ECF No. 29-3, p. 126).

Petitioner arrived at Shumiloff's apartment around 9:00 p.m. and left not long after, because he was not needed for the card game. As he left the apartment, Petitioner asked if the victim lived in the 2300 building to which Shumiloff answered she thought

22

maybe it was 2200. (ECF. No. 29-3, p. 114).

The victim and her boyfriend planned to spend the entire weekend together. (ECF No. 29-3, p. 122). However, the boyfriend left the apartment around 7:00 p.m. to go downtown to play pool with some friends, which upset the victim.(ECF. No. 293, p. 128). After he left, she went to another friend's apartment at Marjorie Garden, remaining from 8:00 p.m. to 11:00 p.m. (ECF. No. 29-3, p. 206).Her boyfriend tried to telephone the victim around 9:45 p.m., and again twice around 11:00 p.m., and when he was unable to reach her, he called the victim's friend, Joan McDonald.(ECF. No. 29-3, pp.129-131).

Country Rock Bar bartender, Florence Frymyer saw Petitioner come back into the bar after 11:30 p.m.  While there, Frymyer handed him a phone call from a male and heard Petitioner say,"I just walked  back from there and I'm going to try to get money for a cab... or I will walk back out." Another bar patron gave Petitioner cab fare, and Frymyer called a taxi to drive Petitioner to the Marjorie Garden Apartment Complex.(ECF No. 29-3, pp. 211-215).

Cabdriver Ronald Simpkins, who knew Petitioner, picked him up at midnight from the Country Rock Bar and drove him to the Marjorie Garden Apartment Complex, where he watched Petitioner enter the door to the 2200 building shortly after midnight.(ECF No. 29-3, pp. 223-227).  Between 12:50 and 12:55 a.m. on January 14, 1984, Alma

Yost, whose bedroom was directly beneath the victim's, was awakened by banging noises in the victim's bedroom. She could hear the victim and a man arguing, heard the victim scream twice, heard something being drug across the floor, and the noise of something banging into the metal closet doors above her own. Because, Alma Yost thought something was wrong, she went to her son's apartment which across from hers. Her son called the maintenance department to send someone to the victims's apartment. (ECF. No. 29-3, p. 172-178).

Maintenance man David Antonini received the call at approximately 1:00 a.m. He had been called to the victim's apartment once before because the victim was subject to violent seizures. The maintenance department had master keys to allow entry into all of the apartments. Antonini received no answer when he knocked on the victims's door. His master keys allowed him to unlock the deadbolt and the doorknob lock, but the chain lock was in place and he returned to the maintenance office to obtain another key to unlock the chain. When Antonini returned and was about to unlock the chain, a man asked from inside the apartment "Can I help you?" The man approached the doorway. A dusk-to-dawn light on the outside of the apartment building and the hallway lighting allowed Antonini to observe the man, who was 5' 9-10" and 160-170 pounds, and had brown or dark curly hair with sideburns and mustache. The man informed Antonini that the victim had not been

feeling well earlier in the day, and he had come over to stay with her, and was now feeling better. Antonini then left. (ECF. No. 29-7, pp. 215-221).

Before the murder, Petitioner had been staying for several weeks with Arthur and Carol Rager, who lived at 851 Beechurst Avenue. They were aware Petitioner would frequently sell his plasma for $10 or $15 at Sera Tec because he had no consistent source of income. He went there on the morning of January 13. Petitioner returned to the Rager residence for dinner at 7:00 p.m, after which he left because of his date. Petitioner returned to the Rager's around 2:30 a.m. on January 14. Cara answered the door. Petitioner also got Art out of bed to show them money he had allegedly won at cards. Art noted the money was over $200 in twenties and Carol testified that the amount was $240 in crisp, new twenties. As Petitioner talked, he stated, "I might have been into something last night but I don't remember what." He also said something about seeing blood and an ambulance. Petitioner was unusually quiet after he awakened the next morning, and wanted to listen to the radio news to learn if there had been any trouble. Art went out to buy a newspaper to see if there was any news available from that source. Petitioner left the Ranger residence about midday stating he planned to go to the V.A. Hospital in Clarksburg because his back was bothering him. (ECF No. 29-7, pp. 222-230).

Her boyfriend, who had not been able to reach the victim by telephone through the evening and night of January 13, took a cab from the Country Rock Bar sometime around 3:30 a.m. The cabdriver dropped the boyfriend at the Marjorie Garden Complex. When the boyfriend was unable to get any response from the victim in her apartment, he fell asleep by the door and woke at 7:55 a.m. He then took a cab from the Dorsey Avenue Gary Mart to his residence in Westover. He also called Joan McDonald, again that morning, to try to find the victim. About mid-morning he called the maintenance department at the Marjorie Garden Apartment Complex asking for someone to check on the victim. (ECF. No. 29-3, pp. 132-135).

The victim's body was found in the bedroom of her apartment sometime before noon on January 14, 1984, strangled to death with a leather belt, the body located next to the metal closet door. Her nightgown was pulled down in the front to expose the victim's breasts and also up from the bottom to expose her genitals and there was a small tear in the shoulder. The victim's purse had been rifled and the $240 that had been given to her earlier by her boyfriend was missing. (ECF. No. 29-3, pp. 29-47).

Petitioner telephoned his brother, Gary Shrout, on January 14, 1982, asking if Gary still wanted to go to California. The plan was to hitchhike and to leave on January 15.(ECF. No.29-7, p. 232) At a bar in Columbus, Ohio on Monday night, January 16, 1984, petitioner said, "I thought I killed the girl."(ECF. No. 29-4, p.

29).In his testimony, Petitioner attempted to change the content and context of that statement. However, his version was not supported by Gary in Gary's direct or cross-examination.

Petitioner's's defense was to deny his own guilt and implicate the boyfriend as a possible murder. The jury heard defense witnesses who heard parts of drunken statements made by the boyfriend after the time of the murder, to the effect that he didn't know whether Petitioner had killed the victim, whether he, himself had killed her, or whether he was present at the apartment and two others killed the victim. However, the boyfriend's whereabouts during the late night hours of January 13 and early morning hours of January 14, were accounted for by the Country Rock Bartender, Cindy Frymyer (ECF. No. 29-3, pp. 215-218), cab drivers Robert Pickney and Keith Huffman, as noted above, and Duane Janes. (ECF. No. 29-4. pp. 246-47).[6]

Finally, Petitioner testified that he had obtained the money that he had shown to the Ragers through transacting a marijuana sale at that Double Decker Bar on Walnut Street.(ECF. No. 29-4, pp. 255-257). However, in the state's rebuttal evidence, bartender, Louis Audia, testified that Petitioner had not been present at the Double Decker Bar at all on January 13-14.(ECF No.29-7, pp. 241-242).

---

[6]Mr. Janes testified that he was drinking with Mr. Strawser, the victim's boyfriend, from approximately 11:00 p.m. Friday, January 13, 1984, until 2:00 a.m. on Saturday, January 14, 1984.

## ANALYSIS

In the instance case, the habeas court correctly determined that _Zain 1_ held that once it was determined that Fred Zain had offered any testimonial or documentary evidence in a criminal prosecution, his evidence should be deemed inadmissible and the remaining inquiry was to be whether the evidence present at trial, independent of the forensic evidence presented by Zain, would have been sufficient to support the verdict. Therefore, again as properly noted by the state habeas court, the involvement of Fred Zain in a case does not automatically invalidate a verdict if the non-forensic evidence is found to be sufficient to support the jury verdict. Here, the habeas court concluded that there was sufficient evidence, independent of the forensic evidence, to support the jury verdict.

The undersigned previously detailed the evidence relied upon by the habeas court in making this determination. Clearly there was more than sufficient evidence presented at trial, exclusive of the forensic evidence, from which a jury could have found Petitioner guilty. Petitioner had knowledge that the victim had money; Petitioner was in possession of the same kind of money that the victim had, i.e., new $20.00 bills, in an amount corresponding to the amount the victim had; Petitioner's unusually quite demeanor after he woke the morning of the murder; his desire to listen to the radio news to learn if there had been any trouble; his

statement on January 16, 1984, that "I thought I killed a girl," the testimony of witnesses establishing the boyfriend's whereabouts the night of the murder; and the testimony of witnesses contradicting Petitioner's testimony. Therefore, the decision by the habeas court that there was sufficient evidence to support the jury's verdict of guilt is not based upon an unreasonable determination of the facts in light of the evidence presented in the state proceeding.

However the crux of Petitioner's argument does not rest on the Zain 1 decision. Instead, Petitioner alleges the state court erred by failing to rule that Trooper Inman provided false or misleading evidence causing an innocent man to be incarcerated. In addition, Petitioner argues that the state court erred when it ruled he was not entitled to a new trial.

It is a violation of due process for the State to convict a defendant based upon false evidence. Napue v. Illinois, 360 U.S. 264 (1959). Furthermore, the State is responsible for false testimony even if the prosecutor is unaware of the falsity. Giglio v. United States, 405 U.S. 150 (1972); Miller v. Pate, 386 U.S. 1 (1967). However, a conviction will not be set aside unless it is shown that the false evidence had a material effect on the jury verdict. A new trial will only be granted if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." Napue, 360 U.S. at 271; Giglio, 405 U.S. at 154.

Zain III held that serology reports prepared by employees of the Serology Division of the S=West Virginia State Police Crime Laboratory, other than Fred Zain, are not subject to the invalidation and other structures contained in Zain 1. Under Zain III, a prisoner who is challenging his conviction must prove that the serologist offered false evidence in the prosecution.

Here, the DNA testing conducted as part of Petitioner's 2007 habeas proceeding confirmed most of the results testified to by Trooper Inman. Moreover, the habeas court found that said testing, and the testimony of Lt. Meyers on May 14, 2009, demonstrated that material false evidence was not presented. To the extent that Trooper Inman may have testified that she conducted all of the testing in this case, and it now appears that Fred Zain may have conducted testing on four cigarette butts from the victim's apartment and a pgm test on the victim's known blood, does not establish that Trooper offered false evidence.

Moreover, the habeas court correctly noted that it is Petitioner's burden to satisfy the standards for an award of a new trial. Specifically, Petitioner must present new evidence and: (1) The new evidence must appear to have been discovered since trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained; (2) It must appear from facts stated in his affidavit that the defendant was diligent in discovering the new evidence, and that it could not

have been discovered with due diligence before the trial; (3) Such evidence must be new and material, and not merely cumulative; (4) The evidence must be such that it ought to produce an opposite result at new trial on the merits; and (5) A new trial will generally be refused if the sole subject of the new evidence is to discredit or impeach an opposing witness. <u>Zain III</u>, 633 S.E.2nd at 769 (citing <u>State v. Frazier</u>, 253 S.E.2d 534 (W.Va. 1979)).

Here, Petitioner offered no new evidence whatsoever. Moreover, the results of the DNA results on the vaginal swabs in 2008, would be more damaging Petitioner than the serological evidence in 1984.[7] Accordingly, the decision by the habeas court, denying petitioner habeas relief was neither contrary to, nor an unreasonable application of, clearly-established federal law.

## RECOMMENDATION

For the reasons stated herein, it is respectfully **RECOMMENDED** that the respondent's Motion for Summary Judgment (ECF No. 29),be **GRANTED** and this matter be **DISMISSED** from the court's docket.It is further **RECOMMENDED** that Petitioner's Motion for Appropriate

---

[7]Trooper Inman testified that the petitioner was a potential donor of the of the sperm faction identified from the vaginal swab. She further testified that he was a member of 33% of the possible donating population. The DNA testing determined that the petitioner could not be excluded as a possible contributor to the mixture of DNA identified from the vaginal swab. In addition, he was reported to be one in 630,000 randomly selected unrelated individuals who could have contributed to the spermatozoa on the vaginal swab from the victim's body.

Relief[8] (ECF No. 35)be **DENIED AS MOOT**. Any party may, within fourteen [14] days of the filing of this recommendation, file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections shall also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985): United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is directed to mail a copy of this Report and Recommendation to the pro se petitioner by certified mail, return receipt requested, to his last known address as reflected on the docket sheet, and to counsel of record via electronic means.

DATED: July 21, 2014

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

---

[8]Petitioner filed the motion noting that in adopting the undersigned first report and Recommendation, the Court ordered Respondent to answer the merits of the petition within twenty-eight days. Petitioner alleged that it had been seventy days and Respondent had not filed his answer. In truth, Respondent filed his Answer, Motion for Summary Judgment and a Memorandum of Law within hours of the Order adopting the Report and Recommendation and mailed the documents to Petitioner that same day.